ROBERT J. BRYAN, United States District Judge
THIS MATTER comes before the Court on Defendant The GEO Group, Inc.'s Motion to Dismiss Class Action Complaint for Damages. Dkt. 8. The Court has considered Defendant's motion, Plaintiff Chao Chen's Response, Defendant's Reply, the Complaint, and the remainder of the file herein. Dkts. 1, 15, 16. The Court also considered oral argument held in open court on November 20, 2017.
Mr. Chen was a detainee at the Northwest Detention Center in Tacoma, Washington, a facility that GEO operates under a contract with United States Immigration and Customs Enforcement (ICE), a division of the Department of Homeland Security. GEO uses detainees, including Mr. Chen, to assist in operating the facility under a Voluntary Work Program. In exchange for their work, GEO compensates detainees $1 per day.
The Complaint alleges that Mr. Chen is entitled to compensation of $11 per hour because he is an "employee" as defined by the Washington State Minimum Wage Act. Defendant's motion seeks dismissal under Fed. R. Civ. P. 12(b)(6) under two theories: (1) State law is preempted, and (2) the Complaint fails to state a claim that detainees, including Mr. Chen, are "employees" deserving State minimum wage protections.
I. BACKGROUND
A. Facts.
1. The Complaint.
The following facts alleged in the Complaint are taken as true for purposes of Defendant's Fed. R. Civ. P. 12(b)(6) motion.
GEO, a private corporation, has owned and operated the Northwest Detention Center, a 1,500 bed ICE facility, since 2005. Dkt. 1 at ¶ 4.2. Northwest Detention Center detainees include Mr. Chen, who was detained pending immigration proceedings from October 2014 until February 2016. Id. at ¶ 3.1. Mr. Chen is a citizen of the People's Republic of China, but has been a lawful permanent resident of the United States since the 1980s. Id. at ¶ 3.1. GEO relies upon detainees for its grounds maintenance, cooking, laundry, cleaning, and other services. Id. at ¶¶ 4.4, 4.5. GEO has compensated detainees, including Mr. Chen, at $1 per day. Id. at ¶¶ 4.7, 4.8. GEO has in some cases alternatively compensated detainees with more and better food. Id.
*1162 Washington's minimum wage is $11 an hour. Dkt. 1 at ¶ 4.11. The Complaint alleges that Mr. Chen is entitled to compensation at that rate. Id. at ¶ 4.11.
The Complaint seeks damages for lost wages, fees, and costs[1] on behalf of a proposed class, including Mr. Chen and others similarly situated. Dkt. 1 at ¶ 6.4.
2. Extra-pleadings.
The Contract and Voluntary Work Program.
According to Defendant, GEO operates the Northwest Detention Center by "a complex statutory, regulatory, and contractual relationship" with ICE. Dkt. 8 at 8. See Dkt. 1-1 at ¶ 4.3. The contract central to the GEO-ICE relationship ("the Contract"[2] ) sets out terms for a ten-year operation of the facility. Dkt. 19 at 47. The Contract requires of GEO, inter alia , that "[d]etainee labor shall be used in accordance with the detainee work plan developed by the Contractor, and will adhere to the ICE PBNDS [Performance-Based National Detention Standards] on Voluntary Work Program." Id. at 86. See also , id. at 49. Further, "the detainee work program shall not conflict with any other requirements of the contract and must comply with all applicable laws and regulations." Id.
The Voluntary Work Program articulates standards, inter alia , prohibiting discrimination, accommodating disabilities, limiting work to "8 hours daily, 40 hours weekly," and compensating detainees. 2011 Performance-Based National Detention Standards, Section 5.8, Voluntary Work Program, available online at http://www.ice.gov/detention-standards/2011/ (last accessed Nov. 30, 2017). The detainee compensation provision of the Voluntary Work Program states:
Detainees shall receive monetary compensation for work completed in accordance with the facility's standard policy. The compensation is at least $1.00 (USD) per day. The facility shall have an established system that ensures detainees receive the pay owed them before being transferred or released.
Id.
Irrelevant information.
Defendant highlights facts surrounding the criminal conviction forming the basis for removal proceedings against Mr. Chen. Dkt. 8 at 9. These details are not relevant to resolving Defendant's motion.
B. Defendant's Motion to Dismiss.
Defendant seeks dismissal under Fed. R. Civ. P. 12(b)(6) on two grounds, preemption and failure to state a claim. Concerning preemption, Defendant argues that the State's minimum wage provision is preempted by (1) express preemption, through 8 U.S.C. § 1324a(h)(2), a provision of the Immigration Reform and Control Act (IRCA), (2) field preemption, because Congress has occupied the field of immigration detention, which includes regulating detainee pay, and (3) conflict/obstacle preemption, because requiring GEO to follow the State's minimum wage creates a clear conflict between state and federal law and frustrates ICE purposes and objectives. Dkt. 8 at 15-22. Defendant argues, in the alternative, that the Complaint fails to state a claim that detainees, including *1163 Mr. Chen, are "employees" deserving State minimum wage protections. Id. at 23-29.
II. STANDARD UNDER FED. R. CIV. P. 12(B)(6)
Fed. R. Civ. P. 12(b) motions to dismiss may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. Balistreri v. Pacifica Police Department , 901 F.2d 696, 699 (9th Cir. 1988). Material allegations are taken as admitted and the complaint is construed in the plaintiff's favor. Keniston v. Roberts , 717 F.2d 1295 (9th Cir. 1983). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly , 550 U.S. 544, 554-55, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555, 127 S.Ct. 1955. The complaint must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 547, 127 S.Ct. 1955.
Where a state law claim is preempted by federal law, dismissal may be granted under Fed. R. Civ. P. 12(b)(6). E.g., Cleghorn v. Blue Shield of Cal. , 408 F.3d 1222, 1225 (9th Cir. 2005) (affirming dismissal of state law claims preempted by ERISA).
III. PREEMPTION
A. Preemption generally.
The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land[,]...anything in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, or (3) obstacle/conflict preemption. Nat'l Fed'n of the Blind v. United Airlines Inc. , 813 F.3d 718, 724 (9th Cir. 2016). "Regardless of the type of preemption involved-express, field or conflict-the purpose of Congress is the ultimate touchstone of pre-emption analysis." Id.
Analysis "starts with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana , 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981). This presumption applies in "all pre-emption cases, and particularly in those in which Congress has legislated...in a field which the States have traditionally occupied." Medtronic, Inc. v. Lohr , 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (internal quotations and citations omitted). "[L]abor standards fall[ ] within the traditional police power of the State." Fort Halifax Packing Co. v. Coyne , 482 U.S. 1, 21, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). See also , RCW 49.46.005(a). The party seeking to set aside state law bears the burden to show preemption. PLIVA, Inc. v. Mensing , 564 U.S. 604, 634, 131 S.Ct. 2567, 180 L.Ed.2d 580 (2011).
B. Express preemption.
Express preemption applies where Congress explicitly states its intent to preempt state law in the language of a statute. Cipollone v. Liggett Group, Inc. , 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Where Congress has expressed an intent to preempt state law, the scope of the preemption is determined by examining congressional intent, beginning with the legislative text, "which necessarily *1164 contains the best evidence of Congress' preemptive intent." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). Courts also consider the "statutory framework," as well as the "structure and purpose of the statute as a whole." Lohr , 518 U.S. at 486, 116 S.Ct. 2240 (1996). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption. Altria Group, Inc. v. Good , 555 U.S. 70, 77, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008) (internal quotations and citations omitted).
Defendant points to § 1324a(h)(2) of the Immigration Reform and Control Act (IRCA) as expressly preempting the State minimum wage provision. Dkt. 8 at 16; Dkt. 16 at 7-9. Through IRCA, Congress created "a comprehensive scheme prohibiting the employment of illegal aliens in the United States." Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 147, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002) ; § 1324a(a). The sole preemption provision under IRCA, § 1342a(h)(2), prevents state and local governments from "imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ...unauthorized aliens." § 1324a(h)(2).
At issue is how broadly to define the term "sanction" under § 1324a(h)(2). According to Defendant, the term should be broadly construed to include lost wages, attorneys fees, and costs for minimum wage violations. Dkt. 8 at 16; Dkt. 16 at 8, citing to RCW 49.46.20, RCW 49.46.090, and RCW 49.46.100. Plaintiff acknowledges that the term is undefined and argues that the term refers to a "penalty or coercive measure," whereas the Washington Minimum Wage Act only provides a remedy of monetary damages for back pay and related costs. Dkt. 15 at 11, 12. Plaintiff also argues that because employing unauthorized aliens is the act that IRCA "sanctions," only state laws imposing sanctions for that conduct fall within IRCA's express preemption clause. Id.
Both parties agree that § 1324a(h)(2) is an express preemption statute. There are no other express preemption provisions under IRCA, so the key question is what Congress intended for § 1324a(h)(2) to preempt. Section 1324a(h)(2) prohibits states from imposing civil or criminal sanctions "upon those who employ...unauthorized aliens[.]" Put differently, states cannot penalize employers for employing unauthorized aliens. Even if, as Defendant argues, the provisions of the Washington Minimum Wage Act are construed as "sanctions," they would not be imposed on account of employers hiring unauthorized aliens, but rather because of the failure to pay the prevailing minimum wage. See RCW 49.46.020. Indeed, the Washington Minimum Wage Act nowhere mentions immigration status, aliens, or any related term. See RCW 49.46 et seq. Section 1324a(h)(2) does not preempt the State minimum wage provision.
In defense of its view that the term sanction should interpreted broadly to include lost wages, attorneys fees, and costs, Defendant relies on Chamber of Commerce of U.S. v. Edmondson , 594 F.3d 742, 765 (10th Cir. 2010). Dkt. 18 at FN 41. In Edmondson , the court analyzed an Oklahoma statutory scheme (now-repealed) that "subject[ed] employers to cease and desist orders, reinstatement, back pay, costs, and attorneys' fees" for hiring unauthorized aliens, concluding that "[s]uch impositions...fall within the meaning of § 1324a(h)(2) sanctions." Id. (emphasis added). Edmondson is inapposite. Even if Edmondson was binding precedent, analysis of the term "sanction" was done in the context of a preliminary injunction, with focus on the likelihood-and not the actual *1165 merits-of whether the Oklahoma law would be preempted. More importantly, the mention of back pay was dicta and had no bearing on the holding of the case. The court focused on the attempt by the Oklahoma legislature to create a work authorization program that excluded unauthorized aliens from employment, which falls squarely within what § 1324a(h)(2) precludes states from doing.
Defendant has not shown that the State minimum wage provision is expressly preempted.
C. Field preemption.
"States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." Arizona v. U.S. , 567 U.S. 387, 399, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). Congressional intent to displace state law can be inferred from either "a federal interest...so dominant that the federal system will be assumed to preclude enforcement of state laws," or where "a framework of regulation [is] so pervasive...that Congress left no room for the States to supplement it[.]" Id. , citing to Rice v. Santa Fe Elevator Corp. , 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) (internal quotations omitted). "The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." Hillsborough Cty, Fla. v. Automated Med. Labs., Inc. , 471 U.S. 707, 714, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). "Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive," but rather, courts consider "evidence [of] a desire to occupy a field completely." R.J. Reynolds Tobacco Co. v. Durham Cnty., 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986).
Defendant does not cogently articulate a dominant federal interest that would preclude enforcement of State minimum wage laws, see Dkt. 8 at 17-19; Dkt. 16 at 9-11, so analysis should focus on ascertaining congressional intent within a framework of regulation. Recent Ninth Circuit precedent has emphasized "the importance of delineating the pertinent area of regulation with specificity before proceeding with the field preemption inquiry." Nat'l Fed'n of the Blind , 813 F.3d at 734. Here, the pertinent area of regulation is detainee wages.
Defendant has assembled a hodgepodge of federal statutes and argues that Congress intends to regulate the field of immigration detention generally, including detainee wages. See Dkt. 16 at FN16, citing 8 U.S.C. §§ 1103, 1225, 1226, 1226a, 1231, 1324a, 1555(d). Surveying the authority from Defendant, it cannot be said, with any degree of clarity, that Congress intends to occupy the field of detainee wages. At best, Defendant has highlighted general sources of authority for ICE agency action, but as discussed below, ICE has not created a regulatory scheme preempting state law through its policies, including the Voluntary Work Program. These statutes do not together show that Congress intends detainee wages to be part of IRCA's "harmonious whole." Arizona , 567 U.S. at 401, 132 S.Ct. 2492.
The most to be gleaned about congressional intent to occupy the field of detainee wages can be found in 8 U.S.C. § 1555(d). Section 1555(d) authorizes congressional appropriations for "payment of allowances [to detainees]...for work performed," but payment is limited to "such rate as may be specified from time to time in the appropriation Act involved." § 1555(d) (emphasis added). Under this section, Congress arguably speaks to detainee wages when Congress appropriates payment of allowances to detainees for work performed, but although *1166 § 1555(d) is still in effect, Congress has not specified any rate for detainee work since fiscal year 1979. At that time, Congress appropriated funds for "payment of allowances (at a rate not in excess of$1 per day)...for work performed." PL 95-431 (HR 12934), PL 95-431, Oct. 10, 1978, 92 Stat 1021 (emphasis added). At least since fiscal year 1979, Congress has abandoned direct appropriations payment of allowances, despite its awareness of how to do so. See, e.g., Consolidated Appropriations Act, 2016, PL 114-113, December 18, 2015, 129 Stat 2242, 2497. From the text of § 1555(d), Defendant has not shown that Congress intended to preempt state law regarding detainee wages.
Defendant has offered no satisfactory explanation for the congressional silence since 1979, other than to make general representations about congressional delegation of authority to ICE[3] . Congress could delegate the authority to create a framework regulating detainee wages to ICE, but Defendant has not made this showing. The question remains then, where the $1 per day detainee wage rate comes from, if not from Congress, and the only answer is the Voluntary Work Program. However, the Voluntary Work Program is an ICE policy with no preemptive force at law.
If ICE intended for the Voluntary Work Program to preempt state law on the issue of detainee wages, ICE would need to follow at least two sets of requirements, which it has failed to do. First, as Plaintiff points out, ICE, like all federal agencies, is subject to Executive Order 13132, which requires agencies to follow specific rules when intending to preempt state law through agency policy. Dkt. 15 at 16; Federalism, 64 FR 43255, E.O. 13132 (1999). Second, for agency policy to have the force of law, agency rule-making processes must approach at least the spirit of Administrative Procedure Act (APA) formalities. See United States v. Mead , 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) and its progeny. Defendant has made no showing that ICE made efforts to observe either set of requirements when creating the Voluntary Work Program. The policy's transience is highlighted by defense counsel's oral acknowledgement that ICE could modify the Voluntary Work Program at any time without notice. The Voluntary Work Program should not be viewed as a regulatory scheme with the legal force to preempt state law.
In summary, Congress has not chosen to occupy the field of detainee wages. There is no showing that Congress intended for its general appropriations after 1979 to delegate to ICE the authority to preempt state law as to detainee wages. ICE policy on detainee wages, specifically, the Voluntary Work Program, does not show a clear agency intent to preempt state law, where there is no showing that ICE attempted to observe formalities that underlie its authority to do so.
Defendant has not shown that the State minimum wage provision is field preempted.
D. Conflict/obstacle preemption.
Conflict preemption exists "where it is impossible for a private party to comply with both state and federal requirements," and obstacle preemption exists "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." English v. General Elec. Co. , 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Defendant argues that the State's minimum wage provision is preempted by both conflict and obstacle preemption.
*1167 On conflict preemption, Defendant argues that IRCA, which prohibits the hiring of unauthorized aliens, and the State's minimum wage provision, which would require GEO to treat detainee-workers as "employees" deserving the State minimum wage, are in conflict, making it impossible for GEO to comply with both. Dkt. 8 at 8; Dkt. 16 at 11. "Hiring virtually any detainee" would violate IRCA, Defendant opines. Id. at 12. Plaintiff contests Defendant's representation that GEO could not abide by both IRCA and the State's minimum wage provisions and represents that "many" detainees could work lawfully within IRCA's constraints. Dkt. 15 at 17-19.
Defendant's conflict preemption argument is premature, because it relies on factual determinations about the status of detainees. Defendant has challenged the pleadings under Fed. R. Civ. P. 12(b)(6), which means that the Court must resolve the motion based on allegations in the Complaint. See Dkt. 1.
Defendant's obstacle preemption argument is wandering and opaque, see Dkt. 8 at 20-22; Dkt. 16 at 11-13, but Defendant appears to point to several federal objectives and purposes that may be obstructed: increased costs to ICE, and, ultimately taxpayers; a "balkanized patchwork" of state laws; and the undermining of ICE's authority to care for detainees. Id.
Defendant's obstacle preemption argument is also premature, because addressing whether the federal objectives and purposes will be obstructed would require resolution of factual determinations far beyond the pleadings.
In sum, the conflict/obstacle preemption issues may become ripe at summary judgment or at trial, but at present factual issues abound that preclude a decision based on the pleadings, and before discovery. Defendant has not shown that the State minimum wage provision is conflict or obstacle preempted.
Admittedly, at first blush the issue of preemption would seem to favor Defendant, given the long history of federal legislation and agency action in the area of immigration detention generally. After peeling back the rhetoric and examining the actual statutes and regulations, on the issue of detainee wages, an area of traditional state prerogative, the Court cannot find evidence of congressional intent-either express or implied-sufficient to overcome the presumption against preemption. Defendant's motion to dismiss based on preemption should be denied.
IV. FAILURE TO STATE A CLAIM
Defendant contends that the Complaint fails to state a claim because detainees are not "employees" under Washington law. The Washington Minimum Wage Act defines "employee" generally as "any individual employed by an employer," subject to an enumerated list of exceptions. RCW 49.46.010(3). Defendant argues that detainees fall under an exception, subsection (3)(k), which excepts from the general definition, "Any resident, inmate, or patient of a state, county, or municipal correctional, detention, treatment or rehabilitative institution[.]" RCW 49.46.010(3)(k).
Beginning with the statute itself, it is plain that the definition excepts residents of "state ... detention" facilities, not federal facilities. See RCW 49.46.010(3)(k). The Northwest Detention Center is a federal detention facility and thus does not fall under the exception. This conclusion is reinforced by Washington law narrowly construing exceptions in favor of the employee. See Anfinson v. FedEx Ground Package Sys., Inc. , 174 Wash.2d 851, 870, 281 P.3d 289 (2012).
Anticipating this result, Defendant urges an expansive interpretation of the *1168 exception to federal detainees. (This is an ironic request, because elsewhere Defendant argues that the State deliberately omitted federal detainees from the statutory exception because it would be "outlandish" for the State to include them.) Defendant urges this Court to follow Menocal v. GEO Grp., Inc. , 113 F.Supp.3d 1125, 1129 (D. Colo. 2015) and Whyte v. Suffolk Cty. Sheriff's Dep't , 91 Mass.App.Ct. 1124, 2017 WL 2274618 (Mass. App. Ct. May 24, 2017). Menocal and Whyte considered the application of state minimum wage laws of Colorado and Massachusetts, respectively, to federal detainees. Both cases rely on Alvarado Guevara v. Immigration & Naturalization Serv. , 902 F.2d 394 (5th Cir. 1990), which considered whether the Fair Labor Standards Act (FLSA) applies to federal detainees. But see Hale v. State of Ariz. , 967 F.2d 1356, 1362-63 (9th Cir. 1992), on reh'g, 993 F.2d 1387 (9th Cir. 1993) (leaving open the possibility that the FLSA could apply to incarcerated inmates).
Neither Menocal , Whyte , nor Alvarado is binding precedent, and in this Court's view, extending the logic of Alvarado to interpret this State's statutory exception to include federal detainees moves beyond interpretation to legislation. In the absence of binding authority, the undersigned should respectfully decline the invitation to add to the statute.
In conclusion, Defendant's motion to dismiss for failure to state a claim boils down to the argument that the legislature intended to do something it did not do, or that it should have done something that it did not do. This Court should not re-write legislation. At least based on the pleadings, it is plausible that the Plaintiff, arguably, comes within the State definition of "employee," and is not subject to any existing statutory exception.
V. CONCLUSION
Defendant has not overcome the presumption against preemption by showing congressional intent to displace state law as to detainee wages. The Complaint states a claim upon which relief can be granted, because it is plausible that Plaintiff is an "employee" under Washington law.
THEREFORE, Defendant The GEO Group, Inc.'s Motion to Dismiss Class Action Complaint for Damages (Dkt. 8) is HEREBY DENIED.
IT IS SO ORDERED.
The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Compare to the companion case, State of Washington v. The GEO Group Inc. , Cause No. 3:17-cv-05806-RJB, Dkt. 1-1 at 7 (seeking injunctive and declaratory relief and an award for unjust enrichment).

Only a redacted version of the Contract has been considered, because the full contract, which redacts pricing information, is not part of the record. See Dkt. 19. Whether the Contract should be sealed, redacted, or produced in full is the subject of a pending motion. Dkt. 20.

But Defendant appears to forgo this argument in Reply, see Dkt. 16 at 10 ln. 21.